**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-1749-WJM-SKC

TITAN MANUFACTURING SOLUTIONS, INC., a Nevada corporation,

     Plaintiff,

v.

NATIONAL COST, INC., a Florida corporation d/b/a National Tax Group,
LEE FERRY, and
STEPHANIE REYNOSO,

     Defendants.

---

## ORDER DENYING RENEWED MOTION FOR PRELIMINARY INJUNCTION

---

Plaintiff Titan Manufacturing Solutions, Inc. ("Plaintiff"), sues Defendants National Cost, Inc., Leigh Ferry, and Stephanie Reynoso (together, "Defendants") for breach of contract, trade secret misappropriation in violation of the Colorado Uniform Trade Secrets Act ("CUTSA"), Colo. Rev. Stat. §§ 7-74-101 to -110, and related causes of action. Currently before the Court is Plaintiff's Renewed Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 38.) Despite the motion's title, it only attempts to justify a preliminary injunction, not a temporary restraining order.

For the reasons explained below, the Court finds that no evidentiary hearing is needed because Plaintiff fails to show that it faces irreparable harm, even accepting Plaintiff's version of the facts. The motion is therefore denied.

### I. BACKGROUND

The following narrative is drawn from Plaintiff's perspective, unless otherwise

noted.[1]

Plaintiff "develops proprietary tax solutions for, among other things, the Research and Development Tax Credit (the 'R&D Tax Credit')." (ECF No. 38-1 ¶ 2.) The R&D Tax Credit is particularly complex. (*Id.* ¶ 3.) "Among other software solutions, [Plaintiff] developed Titan Armor®, an online, web-based software platform that efficiently captures, defensibly documents, and accurately calculates the R&D Tax Credit." (*Id.* ¶ 5.) "Oversimplified, Armor is essentially a highly-specialized version of TurboTax® for the R&D Tax Credit." (ECF No. 38 at 2 n.1.)[2] Armor is a particularly effective tool because Plaintiff itself assists taxpayers claiming the R&D Tax Credit, and Plaintiff has spent ten years providing free audit support to those clients, so it "has gained unparalleled insight [in]to how the IRS evaluates the R&D tax credit." (ECF No. 38-1 ¶¶ 4, 9–10, 14.) Plaintiff estimates that it has invested at least 4,000 manhours in these audit support activities, plus another 15,000 manhours specifically in "developing and refining" the Armor application. (*Id.* ¶¶ 6, 11.)

"One proprietary aspect of Titan Armor® is its Task Library, a proprietary list of descriptions of client activity that allows Titan Armor® to sort various research and development expenses into fields for analysis, and provides critical documentation and substantiation for the R&D Tax Credit." (*Id.* ¶ 15.) "The Titan Armor® Task Library is

---

[1] Some of the relevant briefs and exhibits have been filed under Restricted Access. In this order, the Court has endeavored to respect trade secrets and has therefore described certain matters more generically than it otherwise would have. Nonetheless, having weighed the parties' confidentiality interests against the public's right of access, the Court finds that any Restricted material quoted or summarized below does not qualify for Restricted Access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision. *See* D.C.COLO.LCivR 7.2.

[2] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination.

not known outside of Titan and its licensees, each of which has executed licensing and user agreements with strict confidentiality protections." (*Id.* ¶ 16.)

"Another proprietary aspect of Titan Armor® is its Qualifying Questionnaire, a proprietary qualitative assessment of the R&D Tax Credit regulations based on Titan's extensive audit experience.  The Qualifying Questionnaire includes questions that taxpayers are likely to see during the audit process, but that are not present in the Internal Revenue Code." (*Id.* ¶ 20.)

Defendant National Cost, Inc. ("NCI"), describes itself as a "company that helps businesses with their tax solutions, including R&D Tax Credit assistance by providing the necessary documentation consistent with [federal requirements]." (ECF No. 48-2 ¶ 1.)  Defendant Ferry is president of the company. (*Id.*)  Defendant Reynoso is the company's director of operations. (ECF No. 14 at 7, ¶ 6.)

In January 2018, NCI began licensing Armor from Plaintiff. (ECF No. 38-3 at 6.) The cost of the license was a monthly fee ("Monthly Fee") for access to the web platform (*id.* at 3), and then a separate fee for each final report generated ("Report Fee") (ECF No. 48-1 at 12).  NCI, like all licensees, agreed that it would not

> copy, modify, reproduce, distribute, republish, display, post
> or transmit in any form or by any means, create a derivative
> work of, reverse engineer, or decompile any aspect of the
> Service, or otherwise attempt to create unauthorized access
> to the Service and/or modified versions of the Service,
> including (without limitation) for the purpose of building a
> similar or competitive product or service.

(ECF No. 38-3 at 4.)  The Terms of Service that apply to the Armor website contain an identical prohibition, and further prohibit sharing login information with non-licensed parties. (ECF No. 38-4 at 2, ¶¶ 8, 9.)

In February 2019, Defendants hired a third party, Leigh Database Development

3

("Leigh"), to create a Microsoft Access database to replicate Armor's functionality. (*See* ECF No. 38-5.) Defendants say they did so because, among other reasons, they concluded that Armor's cost was not worth the value it created and that NCI "could do the calculations itself" with the assistance of off-the-shelf software like Access. (ECF No. 48-2 ¶¶ 11–13.)

To assist Leigh in building the database, Defendants sent screenshots of Armor (including screenshots of the Task Library and Qualifying Questionnaire) and Armor login information so that Leigh could compare what it was developing to the Armor website interface. (*See* ECF Nos. 38-6 through 38-10.) Leigh partially built the database but then terminated the project, for unexplained reasons. (ECF No. 38-5 ¶ 6; ECF No. 38-11.) Plaintiff "believes"—although it nowhere explains the basis for its belief—that Defendants have "engaged additional developers, including some outside of the U.S., [who are] continuing to develop their database." (ECF No. 38 at 6.)

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy; accordingly, the right to relief must be clear and unequivocal. *See, e.g.*, *Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010). A movant must show: (1) a likelihood of success on the merits, (2) a threat of irreparable harm, which (3) outweighs any harm to the non-moving party, and (4) that the injunction would not adversely affect the public interest. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

## III. ANALYSIS

Among the preliminary injunction elements, "a showing of probable irreparable harm is the single most important prerequisite." *Dominion Video Satellite, Inc. v.*

*Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted) ("*Dominion Video II*"). "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001) ("*Dominion Video I*"). When trade secrets, confidentiality agreements, and similar matters are at issue, the following factors may be helpful to consider when deciding whether a monetary remedy would be effective: "inability to calculate damages, harm to goodwill, diminishment of competitive positions in [the] marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video II*, 356 F.3d at 1263. Finally, whatever else the irreparable harm may be, it "must be certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (internal quotation marks omitted).

Plaintiff argues that it has been and will be irreparably harmed because:

- damages cannot adequately compensate it for the loss of competitive advantage created by Defendants "shortcutting the development process and avoiding the laborious and expensive audit process" (ECF No. 38 at 8; *see also id.* at 9–10);

- damages flowing from "shortcut[ting] the development process" would be difficult to calculate (*id.* at 8);

- "Defendants' use of [Plaintiff's] software and trade secrets interferes with [Plaintiff's] ability to control the dissemination of its proprietary materials" (*id.* at 9); and

- "Defendants have disclosed and will continue to disclose [Plaintiff's] trade secrets" (*id.*; *see also id.* at 10–11).

The Court finds that these contentions fail to demonstrate irreparable harm, for the following reasons.

To begin, one must understand that Plaintiff's claimed loss of competitive advantage is *not* a reduced ability to compete for taxpayers who need help calculating the R&D Tax Credit. Rather, the relevant market is the market for software like Armor, or in other words, competing for the business of accountants and tax consultants who want to more easily help taxpayers calculate the R&D Tax Credit. (*See* ECF No. 53 at 3–4 ("While [Plaintiff] competes with CPAs and consultants generally in providing R&D Tax Credit support, they do not compete with [Plaintiff's] development of R&D Tax Credit software. In duplicating Armor, Defendants have harmed [Plaintiff's] competitive advantage in the smaller market of R&D Tax Credit software developers.").)

The problem for Plaintiff is that it has presented no evidence that Defendants are competing in the market for R&D Tax Credit software. Rather, on this record, the evidence shows only that Defendants created, or attempted to create, an in-house duplicate of Armor so that Defendants can continue to service their taxpayer clients without paying Plaintiff. There is no evidence that Defendants intend to license their database to others. Moreover, given that Defendants commissioned only an Access database (rather than a cloud-based system, for example), it seems unlikely that they have any intent to license it. There is also no evidence that Defendants intend to teach their clients to calculate the R&D Tax Credit on their own—or in other words, to undercut Defendants' own business.

On this record, then, damages are easily calculable. Assuming Defendants have a working Access database that duplicates Armor (and otherwise assuming Plaintiff has stated valid claims for breach of contract, trade secret misappropriation, etc.) then Defendants owe what they would have owed if they had continued to use Armor. Currently, that is the Monthly Fee for every month that the databases in use, and the Report Fee for every final report generated from that database.

Plaintiff contends, however, that continuing to pay these fees will not compensate for "the specific harm [it] has suffered: the duplication of its software." (ECF No. 53 at 2.) But every Armor licensee has, in effect, duplicated Plaintiff's software *vis-à-vis* the licensee's taxpayer clients, and Plaintiff plainly believes that the Monthly Fee and the Report Fee are enough to compensate it for the costs of developing and maintaining the software. As long as Defendants use their Access database in the same way they would have used Armor, then Plaintiff's damages may be calculated by looking to its licensing fees.[3]

As noted, Plaintiff also contends that "Defendants have disclosed and will continue to disclose [its] trade secrets." (ECF No. 38 at 9.) "Have disclosed" appears to refer to Leigh, but Plaintiff does not allege that Leigh continues to possess any trade secrets. Nor, as far as the Court has been made aware, is Plaintiff suing Leigh to stop its potential disclosure of trade secrets. As for "will continue to disclose," Plaintiff's only allegation in this regard is its unexplained and unsubstantiated "belie[f]" that Defendants have "engaged additional developers, including some outside of the U.S., [who are]

---

[3] The Court does not mean to hold that the licensing fees are the only potential measure of damages. However, it is one obvious measure in these circumstances, showing that Plaintiff does not face a harm that cannot be adequately compensated through damages.

continuing to develop their database." (ECF No. 38 at 6.)  Even if this allegation had

support, it would not show that Plaintiff's alleged trade secrets are at risk of public

disclosure.  Rather, without more, it would only show that Defendants continue to use

Plaintiff's alleged trade secrets to develop an in-house substitute for Armor.

Finally, Plaintiff leans heavily on decisions from other judges in this District

regarding irreparable harm in trade secret cases.  (*See* ECF No. 38 at 8–9.)  For

example, Plaintiff highlights *Port-a-Pour, Inc. v. Peak Innovations, Inc.*, 49 F. Supp. 3d

841 (D. Colo. 2014), which states that "[t]he right to use one's property as one wishes—

either to use the property to its own advantage, to exclude another from its use, or to

sell, lease, license or transfer such property to another—is fundamental, and being

excluded from the rights inherent in one's property constitutes irreparable injury."  *Id*. at

872.  But *Port-a-Pour* relies on a *presumption* that trade secret misappropriation creates

irreparable harm.  *See id*. ("when a defendant possesses trade secrets and is in a

position to use them, harm to the trade secret owner may be presumed" (internal

quotation marks omitted; alterations incorporated)).  The Tenth Circuit has since

severely narrowed the circumstances in which irreparable harm may be presumed.  *See*

*First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1140 (10th Cir. 2017) ("Courts

may presume irreparable harm only when a party is seeking an injunction under a

statute that *mandates* injunctive relief as a remedy for a violation of the statute."

(emphasis in original)).  Moreover, even before *Port-a-Pour*, the Tenth Circuit rejected

any automatic presumption of irreparable harm in cases similar to this one:

> Despite the general acknowledgment that irreparable harm
> often arises from the breach of [an exclusivity] agreement,
> courts do not automatically, nor as a matter of course, reach
> this conclusion.  Rather, they examine whether the harms

alleged by the party seeking the preliminary injunction are in fact irreparable, and sometimes conclude in the negative.

*Dominion Video II*, 356 F.3d at 1263.

Here, the Court has examined whether the alleged harms "are in fact irreparable," *id.*—meaning, of course, not adequately compensable through monetary damages, *Dominion Video I*, 269 F.3d at 1156.  Plaintiff has failed to sustain its burden that Defendants' effort to develop an alleged copycat program for calculating the R&D Tax Credit will cause harm that damages will not remedy.  Thus, Plaintiff's motion fails on the irreparable harm element, and the Court need not examine the remaining elements of the preliminary injunction test.

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's Renewed Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 38) is DENIED.

Dated this 17th day of October, 2019.

BY THE COURT:

William J. Martinez
United States District Judge